FILED
DEC 19 2005
U.S COURT OF FEDERAL CLAIMS
ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

(1) Abba International, Inc.
(2) Quality Movers Express, Inc.
(3) Trace International, Inc.
(4) H&B Forwarding, Inc. d/b/a Axis International
(5) AFS, Inc. d/b/a A&B Transportation
(6) Pacific Movers, Inc.
(7) Urban Van Lines, LLC
(8) Volunteer Van Lines, LLC
(9) Academy Van & Storage Co., Inc.
(10) Accent Relocation Service, Inc.,

Plaintiffs

v.

The United States of America,

Defendant

No. 05-1326C

COMPLAINT

Plaintiffs complain of defendant and for their causes of action respectfully represent:

JURISDICTION

1. This Court has jurisdiction over plaintiffs' claims against defendant pursuant to 28 U.S.C. §1491(a).

PLAINTIFFS

2. Plaintiff (1), Abba International, Inc. is a Washington corporation with its principal place of business at Everett, Washington.

3. Plaintiff (2), Quality Movers Express, Inc. is a Kansas corporation with its principal place of business at Midland City, Alabama.

4. Plaintiff (3), Trace International, Inc. is a Delaware corporation with its principal place of business at Midland City, Alabama.

5. Plaintiff (4), H&B Forwarding, Inc. d/b/a Axis International is a Rhode Island corporation with its principal place of business at North Kingstown, Rhode Island.

6. Plaintiff (5), AFS, Inc. d/b/a A&B Transportation is an Alaska corporation with its principal place of business at Kent, Washington.

7. Plaintiff (6), Pacific Movers, Inc. is an Alaska corporation with its principal place of business at Fairbanks, Alaska.

8. Plaintiff (7), Urban Van Lines, LLC is a Tennessee limited liability company with its principal place of business at Memphis, Tennessee.

9. Plaintiff (8), Volunteer Van Lines, LLC is a Tennessee limited liability company with its principal place of business at Memphis, Tennessee.

10. Plaintiff (9), Academy Van & Storage Co., Inc. is a Virginia corporation with its principal place of business at Norfolk, Virginia.

11. Plaintiff (10), Accent Relocation Service, Inc. is a Virginia with its principal place of business at Norfolk, Virginia.

12. Plaintiffs participate as carriers in the Department of Defense (DoD) international and/or domestic procurements for the transportation of household goods

and unaccompanied baggage of military and civilian personnel and their dependents. Plaintiffs are known as Transportation Service Providers (TSPs).

## DEFENDANT

13. Defendant is the United States of America, which at all times relevant hereto acted through the Secretary of Defense, and the Surface Deployment and Distribution Command (SDDC) of the Department of the Army of the United States, and their respective officers and employees.

## FACTS

14. SDDC is designated by DoD as the sole manager of its domestic and international personal property procurement programs, the terms of which are set forth in the Defense Transportation Regulation (DTR), Part IV, DOD 4500.9-R, SDDC's Tender of Service and the terms of the solicitations issued by SDDC semi-annually.

15. Each plaintiff has been qualified by SDDC to participate in its international and/or domestic procurements in accordance with the qualification requirements set forth in SDDC pamphlet 55-4, "How to Do Business in the Department of Defense Personal Property Program", which require each carrier, inter alia, to meet prescribed experience and financial requirements and to execute a Tender of Service.

16. SDDC solicits qualified carriers twice yearly to submit rates to provide service in its respective international and domestic procurements, which rates remain in effect for the duration of the six-month procurement cycle unless cancelled.

17. On or about May 9, 2005, SDDC issued International Rate Solicitation I-16 to solicit qualified carriers to submit rates for the international procurement commencing October 1, 2005 and terminating March 31, 2006, designated as the IW05 procurement. The final rates were required to be filed no later than July 28, 2005.

18. On or about May 15, 2005, SDDC issued Domestic Rate Solicitation D-10 to solicit qualified carriers to submit rates for the domestic procurement commencing November 1, 2005 and terminating April 30, 2006, designated as the DW05 procurement. The final rates were required to be filed no later than August 26, 2005.

19. In July 2002, SDDC announced to industry that effective October 1, 2005, it would change the present personal property procurement to one known as Families First. The essential elements of Families First are a change in the method of shipment distribution from one based primarily on cost to one based on best value, with 70 percent being performance and 30 percent cost; a mandatory substitution of computer- generated transmissions for hard copy documentation by a program known as DPS; and a change in the billing and payment procedures from the military finance offices, by outsource to US Bank through its program known as PowerTrack,

which again substitutes computer-generated communications for hard-copy documents.

20. On March 29, 2004, SDDC determined to test the PowerTrack program in the present procurement, agreeing to reimburse carriers who participated in this test for the one percent fee charged by US Bank for the use of its PowerTrack program. On February 3, 2005, SDDC made participation in this test mandatory, effective April 15, 2005 and committed to continue reimbursement of the one percent PowerTrack fee "until International Winter 05 (IW05) and Domestic Winter (DW05) or Defense Future Personal Property (DPS) Rates are in effect". At the time of issuance of this Notice, the effective date of IW05, DW05 and DPS was October 1, 2005.

21. On June 22, 2005, SDDC announced that it had postponed the effective date of the DPS rates and the roll-out of Families First from October 1, 2005 to February 1, 2006, while making no material change in the effective dates of the current programs, viz., IW05 and DW05. The effective date of the DPS rates and the roll-out of Families First were subsequently postponed by SDDC until October 1, 2006, at the earliest.

22. The postponement of the DPS rates and Families First to February 1, 2006, while maintaining the dates of October 1, 2005 for the effective date of IW05 and November 1, 2005 for DW05 raised a question in the minds of the TSPs participating in these procurements, namely, did SDDC intend to continue its reimbursement of the one percent PowerTrack fee until the DPS rates became

effective and Families First was rolled out, or did it intend to terminate that reimbursement with the effective dates of IW05 and DW05? This question was put before SDDC on numerous occasions by the two trade associations representing the industry, the American Moving and Storage Association (AMSA) and the Household Goods Forwarders Association of American (HHGFAA), as well by several TSPs. SDDC advised the industry on several occasions, orally, by e-mails and on its Web Page, that reimbursement of the one percent PowerTrack fee would continue until the roll-out of Families First and the effective date of the DPS rates.

23. Plaintiffs submitting their final rates for IW05 and DW05 relied on SDDC's confirmation that the PowerTrack fee would continue to be reimbursed. As a result they did not include the one percent PowerTrack fee in those rates. In fact, participants in DW05 were precluded from including this fee in a number of their rates since to do so would have exceeded the cap on domestic rates imposed by SDDC and SDDC would have rejected them. Further, billings for storage-in-transit (SIT), accessorial services rendered in connection with SIT and valuation charges are all subject to the one percent PowerTrack charge and there was no way for a TSP to include the one percent PowerTrack charge for those items since rates on those services are fixed by the terms of both the domestic and international solicitations. This is a significant matter since the majority of shipments subject to the PowerTrack billing fee require SIT.

24. Despite SDDC's prior advices to the contrary, by e-mail, dated October 31, 2005, SDDC advised all TSPs "...that effective with the International Winter 05 (IW05) and Domestic Winter 05 (DW05) rate cycles, the 1% Powertrack Surcharge is no longer reimbursable." Attempts to obtain administrative relief have been unsuccessful, culminating in an e-mail from Colonel Steven L. Amato, the SDDC official responsible for the domestic and international personal property procurements, dated November 10, 2005, reaffirming the denial of the request for reimbursement of the PowerTrack fee for IW05 and DW05.

25. At the time the IW05 and DW05 rates were submitted there were still military bases of the Army, Navy, Marines or Coast Guard which had not been certified for the use of the PowerTrack billing and the Air Force prohibited the use of the PowerTrack billing for any of its shipments. Those shipments were required to be billed to the government finance offices and TSPs did not incur the one percent PowerTrack fee on those shipments.

26. If SDDC had not agreed to continue to reimburse the PowerTrack fee until the roll-out of Families First, the TSPs' only remedy would have been to include that cost in the rates which they submitted in IW05 and DW05. Had they made that election, the TSPs would have overcharged the government on shipments which were not billable under PowerTrack, namely those originated by bases of the Army, Navy, Marines and Coast Guard which were not PowerTrack-certified, and all shipments originated by Air Force bases. No rate distinction can be made on basis of the branch

of service of the military member whose shipment is being transported and there was no lawful way for a TSP to have filed different rates in IW05 and DW05 for Air Force shipments than for those of the other military services.

27. The solicitation pursuant to which TSPs submitted rates in IW05 provided that the TSP "...agrees to bill the appropriate military service finance office responsible for payment..." (Item 426a). This provision was subsequently amended to provide that the TSP "...agrees to submit invoices to US Bank Powertrack for payment." This was an additional requirement since the requirement "to bill the appropriate military service finance office responsible for payment" in the original item was carried forward in the revision to apply to all U.S. Air Force shipments.

28. By Item 306a of the governing solicitation, TSPs participating in both the domestic and international procurements are required to file compensatory rates in each traffic channel and SDDC's final determination to withdraw its reimbursement of the PowerTrack fee, four months after the final rates were submitted in IW05, and three months after the final rates were submitted in DW05, made a number of those rates non-compensatory.

29. Further, SDDC did not amend its IW05 solicitation until October 3, 2005 when it placed a Notice on its Web Page amending the IW05 solicitation to provide for PowerTrack billings, which amendment was made retroactive to October 1, 2005. As a result the requirement for TSPs to bill US Bank via PowerTrack was not furnished TSPs at the time when final rates were required to be submitted in IW05.

COUNT I

30. Plaintiffs allege and incorporate by reference the allegations set forth in paragraphs 1-28 above.

31. As directed by SDDC, plaintiffs billed US Bank using PowerTrack for compensation due for services they performed during IW05 and/or DW05 in reliance upon SDDC's promise that it would continue to reimburse TSPs for fees charged by PowerTrack in connection with such billings. This fee was originally one percent of the total invoiced amount and later was increased to 1.1 percent.

32. Although plaintiffs have billed US Bank by PowerTrack (except for Air Force shipments), as directed by SDDC, SDDC, despite its prior promise, has refused to reimburse TSPs for the PowerTrack fees incurred, and to be incurred, in connection with shipments serviced, and to be serviced, during IW05 and DW05, which began on October 1 and November 1, 2005, respectively.

33. Plaintiffs allege that SDDC has breached its agreement with plaintiffs and is therefore liable to each plaintiff in damages in an amount equal to the fees defendant required each plaintiff to pay US Bank for its PowerTrack billings.

COUNT II

34. Plaintiffs reallege and incorporate herein by reference the allegations set forth in paragraphs 1-29 above.

35. The IW05 solicitation did not require plaintiffs to bill US Bank by PowerTrack but Item 426a, which was in the solicitation furnished TSPs at the time

their rates were required to be filed, provided for billing to the military finance offices which did not require payment by plaintiffs of a fee, as is the case in billings to the US Bank.

36. The requirement to bill US Bank by PowerTrack was first added to the solicitation by amendment of Item 426a, which amendment was made retroactive to October 1, 2005, was not furnished to plaintiffs until October 3, three months after plaintiffs' final rates for IW05 were filed with SDDC.

37. Since the requirement to bill US Bank by PowerTrack, and the incurrence of the PowerTrack fee, was not added to the solicitation until three months after the rates were submitted pursuant to the solicitation, plaintiffs are entitled to compensation on a quantum meruit basis for performing this additional service not contained in the governing solicitation at the time of their rate submissions in IW05.

COUNT III

38. Plaintiffs allege and incorporate by reference the allegations set forth in paragraphs 1-29 above.

39. SDDC previously established maximum rates or rate caps applicable to the domestic personal property program. As a result, defendant's contention that plaintiffs can obtain compensation for billing US Bank by PowerTrack by including the PowerTrack fee in their rates filed in DW05 cannot be sustained. In a number of cases, the PowerTrack fee could not have been added to the rates since they would then exceed the cap established by SDDC which would cause their rejection.

40. Plaintiffs allege that as a result, SDDC has required them to perform services without compensation and they are entitled to payment for performing these additional services on a quantum meruit basis.

COUNT IV

41. Plaintiffs allege and incorporate by reference the allegations set forth in paragraphs 1-29 above.

42. In both IW05 and DW05 compensation for storage-in-transit (SIT), accessorial services rendered in connection with SIT and valuation charges are all fixed by the terms of the governing solicitation. As a result plaintiffs had no ability to increase the amount of their billings for these services.

43. Since the PowerTrack fee is assessed on the billings for accessorial services which are fixed by the rate solicitation and cannot be adjusted by plaintiffs' rate filings, plaintiffs have not, and will not, receive compensation for billing such accessorial services to US Bank by PowerTrack.

44. SDDC, by requiring plaintiffs to incur a one percent fee on PowerTrack billings which is applicable to accessorial services which are fixed by the rate solicitation and cannot be adjusted by plaintiffs' rate filings, has required plaintiffs to furnish services for which they have not been compensated and compensation is requested by this Complaint to be determined on a quantum meruit basis.

## CLAIM FOR RELIEF

WHEREFORE, based on the foregoing, plaintiffs pray that the Court find that each plaintiff is entitled to reimbursement of the fees paid to US Bank for its billings by PowerTrack for services performed in IW05 and DW05, as required by SDDC, and that the Court render judgment for each plaintiff for reimbursement of such costs, including interest on the monies paid to US Bank, in an amount subject to proof, and grant such further relief as the Court may deem just and proper.

Respectfully submitted,

Alan F. Wohlstetter

Alan F. Wohlstetter
DENNING & WOHLSTETTER
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
Tel: (202) 833-8884
Fax: (202) 833-8886
Attorney for Plaintiffs

Stanley I. Goldman
DENNING & WOHLSTETTER
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Of Counsel

Dated: December 16 2005